UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x

In re WESTERN UNION MONEY TRANSFER
LITIGATION



CV-01-0335 (CPS)

MEMORANDUM
AND ORDER

----------------------------------------x
This Document Relates To:
    ALL ACTIONS
----------------------------------------x

SIFTON, Senior Judge.

        In these consolidated actions, plaintiffs assert claims

on behalf of themselves and others similarly situated against

defendant money transfer companies, Orlandi Valuta, Orlandi

Valuta Nacional, Western Union Financial Services, Inc., and

First Data Corporation, based on allegations of racketeering,

unfair or fraudulent business practices, and civil conspiracy in

connection with an alleged scheme of skimming international money

transfer transactions.  By Memorandum and Order dated May 25,

2003, the Court granted the following motions: 1) the plaintiff's

motion for class certification; 2) the parties' joint motion for

preliminary approval of a proposed class settlement agreement;

and 3) the parties' join motion for approval of the proposed

manner and form of notice, and the proposed claim form.  The

Court denied the defendants' application for a preliminary

injunction.  Presently before the Court is plaintiffs' motion for

final approval of the proposed worldwide class action settlement

agreement pursuant to Rule 23(e) of the Federal Rules of Civil

Procedure.

- 2 -

**BACKGROUND**

Defendants are engaged in the business of providing international electronic money transfer services to the general public.  Defendants obtain revenues from these services in two ways.  First, they charge their customers a transaction fee for each transfer they execute.  Second, they derive revenue from the difference between the currency exchange rates at which they purchase foreign currencies in bulk (the "wholesale" rate) and the less favorable exchange rates they charge their customers to convert the funds being transferred to the currency of the destination country (the "retail" rate).  The difference between the wholesale and retail exchange rates is known in the currency exchange market as the "Foreign Exchange Spread" or the "FX spread."  The revenue that defendants derive from the FX spread is referred to as "FX revenue."  Over the period covered by the settlement agreement, defendants collected approximately $461 million in FX revenue from the transactions at issue in this litigation.

Litigation History

This action is the latest in a series of class actions brought by purchasers of defendants' services, alleging that defendants and other money transfer companies, such as MoneyGram Payment Services, Inc., Ria Telecommunications, Inc., Bancomer Transfer Services, Inc., Finmex, Inc., Dolex Dollar Express, and Giromex, Inc., engaged in unfair business practices or related wrongdoing by their practice of collecting FX revenue.  The

- 3 -

gravamen of the plaintiffs' claims in these cases is that the FX revenue constitutes a fee charged by defendants without proper disclosure to their customers.

The first such actions arose in 1997 in the United States District Court for the Central District of California (*Garcia* and *Bueno*).  These purported class actions brought on behalf of a class of California consumers were dismissed on August 4, 1998 with leave to file amended complaints.  Rather than file amended complaints, the named plaintiffs in those actions filed actions in Los Angeles Superior Court alleging only state law claims.

In 1998 two actions were filed in federal district court in Illinois on behalf of nationwide classes against Western Union and Moneygram (*Pelayo* and *Ross-Pineda* respectively); two actions were filed in Texas state court on behalf of statewide classes against Western Union and Moneygram (*Sandoval* and *Fernandez* respectively), one which was subsequently removed to federal district court in Texas; and one was filed in federal district court in California on behalf of a nationwide class against Orlandi Valuta (*Ibarra*).  Eventually the actions in Illinois and Texas were joined and a settlement was reached including distribution of coupons to class members, a *cy pres* contribution by defendants to charitable organizations, a consent decree requiring defendants to disclose their FX revenue practices on advertising materials and transaction forms, payment by defendants of plaintiffs' attorneys fees, and payment by

- 4 -

defendants of expenses relating to notice and settlement
administration.   Plaintiff's counsel in *Ibarra* also agreed to the
terms of this settlement, a nationwide class was certified and
preliminary approval of the settlement was granted.   Certain
class members from California, including the originally named
plaintiffs Garcia and Bueno, intervened and objected.
Nevertheless, the settlement was approved.   On appeal, Judge
Easterbrook in the Seventh Circuit upheld the settlement while
raising questions concerning the merits of plaintiffs' fraud
claims.   *See In re Mexico Money Transfer Litigation*, 267 F.3d 743
(7TH Cir. 2001); *see also In re Mexico Money Transfer Litigation*
*(Western Union and Orlandi Valuta)*, 164 F. Supp. 2d 1002 (N.D.
Ill. 2000).

Following approval of this settlement, several other
cases were filed in various state and federal courts against
defendants and other money transfer companies alleging similar
claims.   Plaintiff's counsel in the present action also represent
the plaintiffs in several such cases.   All these cases were
either dismissed on the ground that plaintiffs could not make out
a case of fraud or settled on terms similar to the terms of the
*Pelayo/Ross-Pineda* settlement.

### Procedural History of the Present Actions

Plaintiff Ana Cruz filed her complaint in the present
action on January 19, 2001, on behalf of a worldwide class.
Plaintiff Nubia Godoy filed a complaint on April 20, 2001, also
on behalf of a worldwide class.   These actions were consolidated

on December 7, 2001, and a first consolidated amended complaint
was filed on December 13, 2001.  The consolidated complaint
asserts claims on behalf of all persons who used defendants'
services to wire funds from a foreign country to the United
States or from the United States to a foreign country other than
Mexico, necessitating a currency exchange.[1]  For jurisdictional
reasons, plaintiffs did not assert claims on behalf of persons
who wired funds from one foreign country to another foreign
country (i.e. transfers of funds sent neither from, nor to the
United States).  Also excluded from the class were persons who
used transaction forms containing the disclosures required by the
*Pelayo/Ross-Pineda* settlement.  By Magistrate Judge Pohorelsky's
order of March 15, 2001, Hagens Berman LLP, Johnson & Bell, Ltd.,
and Kirby McInerney & Squire LLP were named co-lead counsel for
plaintiffs.[2]

From February 2001 through September 2002 counsel
conducted settlement negotiations.  Counsel characterized these
negotiations as having been "conducted in an arm's length
manner," "often contentious and characterized by frequent

---

[1]The amended complaint did not specify a time period
for the use of the defendants' services, though the settlement
agreement limits liability to a period between January 1, 1995
and December 31, 2002.

[2]Additional plaintiffs' counsel include:  Henry H.
Rossbacher of Rossbacher & Associates (now the Rossbacher Firm);
Harry C. Batchelder, Jr.; Robert Shelquist of Lockridge Grindal
Nauen P.L.L.P.; and Greg McEwen of The McEwen Law Firm P.L.L.C.,
all from the *Cruz* action; as well as Richard D. Greenfield of
Greenfield & Goodman LLC and Anthony J. Bolognese of Bolognese &
Associates LLC, from the *Godoy* action.

- 6 -

disagreements." (Roddy Decl., December 13, 2002, ¶ 19).
Plaintiff's counsel recognized and admitted that their claims are
tenuous but believe that they have merit and maintain that
counsel were ready, willing, and able to litigate the claims
through trial.  In June 2002, the parties reached an agreement on
the basic points of a settlement and executed a Memorandum of
Understanding.  However, Mr. Linden of Kirby McInerney & Squire
LLP did not sign this Memorandum of Understanding and Mr. Foster
of Johnson & Bell, Ltd. later withdrew his consent on grounds
that the proposed release language was too broad.  In particular,
counsel objected to Paragraph 5 of the settlement agreement,
entitled "Effect of Compliance with Injunctive Relief," which in
essence declared that, if defendants were to comply with the
injunctive relief contained in the settlement, their challenged
business practices would not be actionable under any principle of
law, on grounds that this paragraph released potential claims not
asserted in the complaint.  They also objected to Paragraph 4.2
of the agreement, which included "the general public" in the
definition of "Releasing Parties," as overbroad.  Remaining
counsel continued to negotiate and draft a settlement agreement,
which they completed in August 2002 and submitted to this Court
for preliminary approval on September 30, 2002, after obtaining
the signatures of all named plaintiffs and their authorized
counsel.  Objecting counsel, Linden and Foster, did not execute
the settlement agreement submitted for preliminary approval.

- 7 -

At a status conference on October 11, 2002, the Court
directed the parties to show cause why the settlement should not
be preliminarily approved and set a schedule for briefing.
During the briefing period, the objections to Paragraph 4.2 of
the settlement agreement were withdrawn and the parties revised
paragraph five.  As a result, no objections to the proposed
settlement remained, and objecting counsel, Linden and Foster,
were included in the first amended settlement agreement filed
with this court on December 16, 2002.

*Class Certification and Preliminary Approval of Settlement*[3]

On March 25, 2003, in a Memorandum and Order, the Court
certified the class and three subclasses, preliminarily approved
the proposed settlement agreement, approved the proposed manner
and form of notice and the proposed claim forms, and denied a
preliminary injunction seeking to bar class members from
litigating parallel or overlapping actions pending consideration
of the settlement for final approval.

The settlement class includes all persons who used
defendants' services to send money electronically 1) from the
United States to a foreign country or territory (excluding
Mexico) from January 1, 1995 to December 31, 2002; 2) from the
United States (excluding California) to Mexico from September 1,
1999 to December 31, 2002; and 3) to the United States from

_____

[3]See Preliminary Approval Order, March 25, 2003, 9-15,
for more detailed definition of settlement class and settlement
terms.

another country or territory from January 1, 1995 to December 31, 2002- provided that the transfer involved a currency exchange and was within a country corridor that produced an average Foreign Exchange ("FX") revenue gain per transaction of at least $1.00. The class definition has an opt-out clause and excludes persons, entities or organizations on various lists of known or suspected terrorists.

The class was divided into three proposed subclasses. Subclass One consists of class members who sent money from the United States to certain foreign countries from January 1, 1995, to the date when defendants modified their documents to include the disclosures required by the Pelayo/Ross-Pineda settlement (the "modification date"). Subclass Two consists of class members who sent money from certain foreign countries to the United States during the same time period. Subclass Three consists of class members who sent money from the United States to certain foreign countries (including Mexico) or from certain foreign countries to the United States between the modification date and December 31, 2002.

Like the settlement in *Pelayo/Ross-Pineda*, the proposed settlement is based primarily on distribution of coupons to class members. Members of Subclass One are to receive a $4.00 coupon for every two qualifying transactions they made. Members of Subclass Two are to receive a coupon with a face value of approximately $3.25 in the appropriate local currency for every one qualifying transaction they made. Coupons will be made

- 9 -

available on a claims-made basis, with a maximum total face value

of approximately $47.5 million.  Coupons will be freely

transferrable, valid for 35 months from the date of issuance, and

usable in conjunction with all other discounts or promotions

offered by defendants except for other coupons issued under the

terms of this or another settlement.  Members of Subclass Three

will not receive coupons, but are described as the beneficiaries

of injunctive relief under the settlement agreement.  This relief

includes additional FX-related notices on the front of

defendants' forms and receipts (rather than the back or on

attached pages, as is defendants' current practice), as well as

on their advertising.  Defendants will also establish a toll-free

number for customers within the United States to call to obtain

information on defendants' offered retail currency exchange

rates.

Preliminary approval of the proposed settlement

agreement was conditioned upon changes to paragraph 4.2., which

purported to release claims by or on behalf of "the general

public" against defendants.  The Court found the language

ambiguous and open to interpretation granting relief beyond the

power of class counsel to authorize or of the Court to grant.

Accordingly, the Court granted preliminary approval on the

condition that the phrase "the general public" be stricken from

Paragraph 4.2 and that a provision be added stating that the

release shall not affect the ability of public officers or

entities to enforce public rights.  The parties accepted the

- 10 -

conditions established by the Court, and in April 2003 the Court approved an amendment appropriately modifying the terms of the agreement.

Defendants agreed to pay plaintiffs' attorneys' fees in addition to (rather than out of) the compensation to class members.  Counsel aver that there was no negotiation concerning defendants' payment of attorneys' fees and expenses until August 2002, after agreement was reached as to the terms and conditions of consideration to be paid to class members and injunctive relief under the settlement, and that fee negotiations were highly contentious.  The parties have agreed that plaintiffs' counsel will apply to the Court for an award of attorneys' fees and expenses, consisting of a lodestar not to exceed $1.5 million and a multiplier not to exceed 1.50, up to a maximum award of $2.25 million.  Defendants agreed to pay the amount ordered by the Court up to this maximum.

The Court approved the proposed notice, subject to two minor changes, that consisted of five elements: (1) direct mail notice of all class members identified by reference to defendants' computer records, (2) published notice in various languages in newspapers, magazines, and "banner ads" on Internet search engines, (3) posted notice, in English and Spanish, displayed by defendants' retail agents in the United States for 90 days, (4) media outreach in the form of a press release, video news release, and radio news release, to be translated into various foreign languages and distributed internationally, and

- 11 -

(5) establishment of a settlement website and toll-free telephone hotlines for class members.

The Court also approved the proposed claim forms. A claim may only be made using directly mailed claim forms. The proposed claim forms do not require class members to produce receipts or other documentary evidence of eligible transactions, rather they require class members to identify, under penalty of perjury, the month and year of eligible transfers, the name of the service used to effect the transfer, the name of the transfer recipient, and the origin and destination country of the transaction.

The preliminary injunction barring class members from litigating parallel or overlapping actions pending consideration of the settlement for final approval was denied.

The parties appeared April 1, 2004 for a status conference, and April 9, 2004 for the class settlement fairness hearing.

### DISCUSSION

The parties jointly move for final approval of the settlement agreement under Rule 23(e) of the Federal Rules of Civil Procedure, which states that class actions "shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R. Civ. P. 23(e).

- **12** -

<u>Notice</u>

"[N]otices to class members can practicably contain only a limited amount of information." *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982). "Although no rigid standards govern the contents of notice to class members, the notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." *Id.* (internal citations and quotation marks omitted).

In the Preliminary Approval Order, the Court directed the parties to make two changes to the notices, but concluded that the notices and claim forms were otherwise adequate. These changes were made and approved by the Court on May 28, 2003 and July 15, 2003. Class action notices were mailed to more than 17.9 million individuals who used defendants' money transfer services from January 1, 1995 to December 31, 2002 depending on the subclass to which the class member belonged.[4]  In response, 3,335 persons opted out and 38 individuals objected to the proposed settlement as of March 25, 2004.

<u>Substantive and Procedural Fairness</u>

"The central question raised by [a] proposed settlement of a class action is whether the compromise is fair, reasonable, and adequate. *Weinberger*, 698 F.2d at 73.  To determine whether

---

[4]For Subclasses One and Two: from January 1, 1995 to the date when defendants began disclosing the FX spread to consumers; For subclass three: from the date when defendants began disclosure to December 31, 2002.

- 13 -

this standard has been met, the court must "compare the terms of the compromise with the likely rewards of litigation." *In re Warner Communications Securities Litigation*, 618 F. Supp. 735, 741 (S.D.N.Y. 1985)(citations omitted). In evaluating the substantive fairness of a proposed settlement, the Court is guided by the nine factors initially enumerated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001) (citations omitted); *see also In re Gulf Oil/Cities Service Tender Offer Litigation*, 142 F.R.D. 588, 590 (S.D.N.Y. 1992)(applying *Grinnell* factors); *In re Warner Communications*, 618 F. Supp. at 740-741(same). The court must also examine the negotiating process that gave rise to the settlement to determine if it was achieved through arms-length negotiations by counsel with the experience and ability to effectively represent the class's interests. *See id.* at 741; *see also D'Amato*, 236 F.3d at 85 ("The District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms.").

- 14 -

**1) *The complexity, expense and likely duration of the litigation***

As the Court noted in its preliminary approval of the proposed settlement, the litigation poses a series of complex logistical problems that will likely be expensive to manage through trial, given that the class is so large and diffuse. Furthermore, as the *Pelayo/Ross-Pineda* court observed, "[d]efendants are highly motivated to defend these cases vigorously" and further litigation would require additional discovery, proof of individual damages, and the resolution of complex issues at considerable expense." *In re Mexico Money Transfer*, 164 F. Supp. 2d at 1019. Presumably, defendants in the present case are similarly motivated to vigorously defend this class action. As the parties note, defendants would be exposed to treble damages for RICO violations, providing further impetus to vigorously defend these charges at trial.

**2) *The reaction of the class to the settlement***

Class action notices were mailed to more than 17.9 million individuals, and the settlement called for published and posted notice, media outreach and the establishment of a settlement website and toll-free telephone number as detailed above. In response, as of March 22, 2004, 38 individuals objected to the proposed settlement, 3,335 requests for exclusion had been received, representing less than .02% of notices mailed, and less than .04% of notices mailed and not returned as undeliverable. This small number of objectors favors approval. *See D'Amato*, 236 F.3d at 86-87 (where 18 objections received out

- **15** -

of 27,883 class notices, weighed in favor of settlement); *see
also In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp.
2d 503, 511 (E.D.N.Y. 2003)("the extremely small number of
objectors - a mere 18 out of approximately five million Class
members - heavily favors approval."); *In re Mexico Money
Transfer*, 164 F.Supp.2d at 1021 (99.9% of class members having
neither opted out nor filed objections indicated strong
circumstantial evidence in favor of the similar settlement
proposal.)  The specific objections of the 38 class members are
discussed in detail below.

**3) The stage of the proceedings and the amount of discovery
completed**

The stage of the proceedings and the considerable
discovery the parties have conducted is "relevant to the parties'
knowledge of the strengths and weaknesses of the various claims
in the case, and consequently affects the determination of the
settlement's fairness.  *In re Painewebber Ltd. Pshps. Litig.*, 171
F.R.D. 104, 126 (S.D.N.Y., 1997).  Following preliminary approval
of this Settlement, four depositions were taken and defendants
made available over 80,000 pages of documents concerning the
particular business practices at issue.  In addition, since 2000,
plaintiffs' counsel have represented various plaintiffs in seven
separate class actions and representative actions against money
transfer companies' including defendants in the present case.
(Roddy Decl., March 25, 2004, § 68-8).  Moreover, as this
settlement is similar to the *Pelayo/Ross-Pineda* settlement, it is

- 16 -

logical to conclude that both parties have had "ample opportunity to reach an informed judgment concerning the merits of the proposed settlements." *In re Mexico Money Transfer*, 164 F. Supp. 2d at 1021-1022.

**4) *The risks of establishing liability and (5) The risks of establishing damages***

"In assessing the adequacy of a settlement, a court must balance the benefits of a certain and immediate recovery against the inherent risks of litigation." *In re Medical X-Ray*, No. CV-93-5904, 1998 U.S. Dist. LEXIS 14888, at *11 (E.D.N.Y. August 7, 1998). The plaintiffs face considerable risks in establishing liability and damages, given the hostility of other courts toward the legal merit of basically identical claims.  The Second Amended Complaint asserts four claims of relief: 1) a civil RICO claim; 2) a claim under the states' consumer protection and deceptive trade practices statutes; 3) a claim under the New Jersey Consumer Fraud Act; and 4) a common law conspiracy claim under the laws of New York, New Jersey and all other states.

The essence of these claims is that defendants had a duty to disclose the FX spread and by not doing so committed fraud.  However, in affirming the settlement approved by the district court in *Pelayo/Ross-Pineda*, Judge Easterbrook noted,

> [W]e think that the claims had only nuisance
> value . . . No state or federal law requires
> either currency exchanges or wire-transfer
> firms to disclose the interbank rate at which
> they buy specie . . .  That is why the

> plaintiffs have been driven to make generic
> fraud claims.  But since when is failure to
> disclose the precise difference between
> wholesale and retail prices for any commodity
> 'fraud'.?

*In re Mexico Money Transfer*, 267 F.3d at 748-749.  Furthermore, a

New York District Court has held that where the exchange rate

offered was disclosed, and the interbank exchange rate was

available in English and Spanish newspapers, a RICO and fraud

claim based on the failure to disclose a foreign exchange rate

margin was defeated because there was no showing of specific

intent to defraud.  *Compania Sud-Americana de Vapores, S.A. v.*

*IBJ Schroeder Bank & Trust Co.*, 785 F. Supp. 411, 424-425

(S.D.N.Y. 1992).  Where the exchange rate offered by defendants

is disclosed on the customer's receipt, defendant may well have

no legal duty to disclose the rate at which currency is

purchased.  *In re Mexico Money Transfer*, 164 F. Supp. 2d at 1015.

Establishing damages will likewise be difficult,

because of the size and diversity of the class and the dispute

over the proper measure of damages.  As this Court has noted,

"[t]he complexities of proving and calculating damages 'increase

geometrically' in class actions."  *In re Medical X-Ray*, 1998 U.S.

Dist. LEXIS 14888, at *13 (quoting *Chatelain v. Prudential-Bache*

*Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992)).  At issue

here are over 47 million transactions in 114 countries and

territories over the course of eight years.  Because currency is

purchased by defendants in bulk, and the exchange rate fluctuates

over time, defendants contend it would be "entirely impractical,

if not impossible" to trace each one of these transactions to the
bulk purchases of currency.  (Joint Memorandum in Support of
Final Approval of Settlement, 34.)  Furthermore, because the main
issue revolves around defendants failure to disclose the FX
spread, there is a fundamental dispute concerning whether damages
should be calculated not as the entire spread, but as the
difference between what class members actually paid, and what
they would have paid had defendants disclosed the interbank rate.
Moreover, "damages are a matter for the jury to decide and 'whose
determinations can never be predicted with certainty.'"  *In re
Medical X-Ray,* 1998 U.S. Dist. LEXIS 14888, at *13 (quoting *In re
PaineWebber,* 171 F.R.D. at 129.)  There are, therefore,
considerable risks of establishing liability and damages which
support approval of the proposed settlement.

### 6) *The risks of maintaining the class action through the trial*

The parties stipulated to class certification for
settlement purposes only.  If the class action were litigated,
however, defendants would oppose certification, noting that the
unique problems of trying this case as opposed to settling it
make class certification inappropriate.  (Joint Memorandum in
Support of Final Approval of Settlement, 35.)  Furthermore, this
Court has noted litigation will likely be expensive to manage,
and is logistically complex.  Although this Court certified the
class, (Preliminary Approval Order, March 25, 2003, 17-23),
defendants' challenge to the maintenance of the class would
create a risk to plaintiffs' eventual recovery through

- 19 -

litigation.  *See In re Medical X-Ray*, 1998 U.S. Dist. LEXIS
14888, at *14 (possibility that defendants would challenge
maintenance of class in absence of settlement was considered risk
to the class and potential recovery).

**7) *The ability of the defendants to withstand a greater judgment***

The parties attest that defendants are financially
solvent, and no argument is proposed that defendants cannot
withstand greater judgment.  Accordingly, this factor neither
supports nor defeats the proposed settlement.

**8) *The range of reasonableness of the settlement fund in light of
the best possible recovery and 9) the range of reasonableness of
the settlement fund to a possible recovery in light of all the
attendant risks of litigation***

As this court has observed, "the adequacy of the amount
offered must be judged not in comparison with the best possible
recovery in the best of all possible worlds, but rather in light
of the strengths and weaknesses of the plaintiff[s'] case."  *In
re Medical X-Ray*, 1998 U.S. Dist. LEXIS 14888 at *15 (internal
quotations and citations omitted.)  After a thorough analysis of
the strength of plaintiffs' case balanced against the proposed
settlement in *Pelayo/Ross-Pineda*, Judge Pallmeyer held that "the
value of the offer weigh[ed] heavily in favor of the settlement."
*In re Mexico Money Transfer*, 164 F. Supp. 2d at 1014.  Here, the
parties suggest that the total value of the settlement represents
approximately 36.5% of the FX Revenue from the relevant

- 20 -

transactions.[5]  Given the best possible outcome, plaintiffs'

thorough familiarity with the merits of this litigation, and the

value of the settlement, the Court finds the settlement within

the range of reasonableness in light of the best possible

recovery and the attendant risks of litigation.  This issue will

be discussed in more detail below, in response to objections

raised regarding the proposed settlement agreement.

**10) Arms-Length Negotiations**

In the Preliminary Approval Order, the Court concluded

that the Settlement Agreement was both substantively and

procedurally fair.  "It is not for this Court to substitute its

judgment as to a proper settlement for that of such competent

counsel in view of the fairness of the settlement to the class

members."  *In re Warner Communications Sec. Litig.*, 618 F. Supp.

at 746.  The proposed settlement does not appear to be collusive,

given the lengthy and detailed negotiations that the parties have

undertaken.  Counsel for both parties attest that the settlement

"was the product of hard-fought, difficult, arms-length, and

---

[5]Based on a maximum of $47.5 million in settlement
coupons to Subclasses One and Two, $18 million in attorneys' fees
and the costs of notice and settlement, the total settlement
would be over $65 million.  The parties only include the total FX
spread revenues from Subclasses One and Two ($178 million) in
assessing the correct measure of damages, arguing that Subclass
Three's claims are much weaker since their money transfers were
sent after defendants disclosed the FX spread following the
*Pelayo/Ross-Pineda* settlement.  This court suggested that the
range of possible recovery, given the risks of litigation, is
anywhere from zero to $461 million, with the likely recovery on
the low end.  (Preliminary Approval Order, March 25, 2003, 25-
26.).

intense negotiations over the course of 18 months [and that] . .
. negotiations were adversarial throughout and in no way
collusive." (Joint Memorandum in Support of Final Approval,
March 25, 2004, 38.) According to class counsel, while it
explored the possibility of settlement, it remained ready,
willing and able to try the case if necessary. Professor Arthur
Miller agreed, stating in his declaration that, after reviewing
the evidence, the negotiations had been hard-fought, adversarial,
and non-collusive. (Arthur Miller Decl. ¶¶ 40-45, 47.)
Furthermore, according to the parties, it was not until August
2002, after the parties had reached an agreement in principle
with respect to all of the substantive issues and terms of the
settlement, that class counsel and defendants' counsel began to
negotiate the amount of attorney fees that class counsel would be
entitled to receive under the settlement agreement.

<u>Objections to the Proposed Settlement</u>

        The objections, with the exception of a joint objection
filed by Mary Esposito and David Plimpton, and an objection by
Jonathan Zell, do not question the overall fairness, adequacy, or
reasonableness of the proposed settlement, but instead address
individual provisions of the settlement.

        The objections may be grouped into five categories: (1)
the joint objection of David Plimpton and Mary Esposito; (2)
objections to less than 100% recovery; (3) objections concerning
the determination of the transfer fees paid and the amounts
transmitted; (4) objections to miscellaneous provisions of the

proposed settlement; and (5) an objection on behalf of a class of individuals who sent money to or from Haiti.  Objections relating to attorneys' fees will be addressed in consideration of the motion for reimbursement of fees and expenses.

*Objections by Mary Esposito and David Plimpton Related to Coupons*

These objections were raised by Mr. Plimpton, and rejected, in another class action, *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 292 F. Supp. 2d 184, 188 (D. Me. 2003)("*Trowbridge II*").  Esposito and Plimpton argue that the settlement provides inadequate compensation to class members, primarily on the following grounds: (1) they would prefer cash to coupons; (2) coupons provide too little value to the class and/or unfairly benefit defendants; (3) coupon redemption rate will be low[6]; (4) the coupons will not be easy to market; and (5) the factors typically relied on as justification for a coupon-only settlement are not present.[7]  Esposito and Plimpton's first three objections are joined by 28, 15 and 1 other class members respectively.

---

[6]Among the reasons given for this contention is that many class members (1) will not bother to read the class action notice; (2) actually object to the proposed settlement but did not take time to formalize their objections; (3) will not update their addresses if they move; (4) are unlikely to take the time to fill out claim forms; and/or (5) will find the coupons more difficult to use than defendants' internet offers.

[7]Among those factors, Esposito and Plimpton argue that coupons are justified only where (1) the cost of distributing cash awards to class members would exceed the value of their respective claims, (2) the members of the class cannot be identified, or (3) the defendant is impoverished.

- 23 -

*Coupons*

The issuance of discount coupons in lieu of cash in settlements has been considered by a number of courts who have faced objections from class members, and courts have regularly approved settlements that provide class members with coupons rather than cash.  *See, e.g., Cusack v. Bank United of Texas*, 159 F.3d 1040 (7th Cir. 1998); *New York v. Nintendo of Am. Inc.*, 775 F. Supp. 676, 681 (S.D.N.Y. 1991)(approving a settlement involving the distribution of five dollar coupons); *In re Mexico Money Transfer*, 164 F. Supp. 2d at 1019; *In re Cuisinart Food Processor Antitrust Litig.*, MDL 447, 1983 WL 153, at *4, 7 (D. Conn. Oct. 24, 1983); *Hanrahan v. Britt*, 174 F.R.D. 356 (E.D. Pa. 1997); *Weiss v. Mercedes-Benz of North America*, 899 F. Supp. 1297 (D.N.J. 1995); *Williams v. General Elec. Capital Auto Lease*, No. 94 C 7410, 1995 WL 765266 (N.D. Ill. Dec. 26, 1995); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993).

However, as the Court of Appeals for the Seventh Circuit noted in *In re Mexico Money Transfer*, a case with a settlement similar to that proposed in this case, the use of coupons does raise legitimate concerns:

> This is one of many class actions in which everyone other than the plaintiffs has been paid in cash. The attorneys got cash, the charitable organizations got cash, and the customers got coupons.  That's enough to raise suspicions – especially because coupons serve as a form of advertising for the defendants, and their effect can be offset (in whole or in part) by raising prices during the period before the coupons expire.

*In re Mexico Money Transfer*, 267 F.3d at 748-749.   The court went
on to rule, however, that the mere fact the plaintiffs would have
preferred cash to coupons did not in itself form a basis for
rejecting the settlement:

> The objectors do not say that the lawyers have been
> overpaid; they say that the customers have been
> underpaid. And that contention cannot be evaluated by
> stopping with the fact that compensation in kind is
> worth less than cash of the same nominal value.
> (Coupons are stand-ins for the wire transfer service,
> making them a form of in-kind payment.)

*Id.*   The central question, the Seventh Circuit noted, is not
whether coupons are as valuable to a plaintiff as cash, but
rather "whether the value of relief in the aggregate is a
reasonable approximation of the value of plaintiffs' claim."   *Id.*
The court reasoned that the value of the coupons to be redeemed
($40-$60 million or 10-15% of the estimated face value of the
coupons), the *cy pres* funds ($4.6 million) and injunctive relief
alerting class members to the FX spread (including $16 million
for notice) amounted to more than the value of the plaintiffs'
claims, especially when considering the unlikelihood of success
at trial.   *Id.*   Other courts have reached similar conclusions.
*See, e.g., Trowbridge II*, 292 F. Supp. 2d at 187, n.2 (approving
a 75%-off coupon settlement where an all-cash settlement to over
8 million class members would not be practical, given the amount
of cash likely to be available.)[8]; *Nintendo of Am. Inc.*, 775 F.

---

[8]Judge Hornby rejected the initial settlement proposal
because the 50%-off coupons did not represent a significant value
(continued...)

Supp. at 681 ("The coupons, while not an ideal form of compensation, are adequate.  Consumers obviously would prefer a check or cash.")[9]; *In re Cuisinart*, 1983 WL 153, at *7 ("[T]he fact that some objectors would have preferred cash cannot be determinative of the issue whether the settlement before the court is reasonable.").

Here, the parties estimate that defendants collected approximately $461 million from the transactions at issue.  As mentioned above, the settlement in the present case proposes a maximum of $47.5 million in coupons, and $18 million in costs of notice and attorneys fees, representing 14% of the total FX revenues collected.  Defendants note, however, that Subclass Three claims should not be included in the figure for best possible recovery because defendants had disclosed their practice of including the FX spread into the transaction costs for these class members.  Accordingly, the proposed settlement represents approximately 38% of the FX spread from transactions made by

---

[8](...continued)
to class members who regularly received similar offers from the record clubs in their ordinary marketing promotions.  *In Re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 221 (D. Maine, 2003)("*Trowbridge I*").

[9]In evaluating the value of the coupon program to compensate consumers for anti-trust violations resulting in increased prices for Nintendo's game consoles, the court considered the impracticality of a cash settlement, and that the coupons were transferable and constituted a directed benefit to class members.  *Nintendo of Am. Inc.*, 775 F. Supp. at 681.

members of Subclasses One and Two.[10]  Moreover, defendants note

that, given other courts' treatment of similar claims, it is

likely that if plaintiffs proceeded to trial, they would recover

nothing at all.  Thus, the range of possible recovery is anywhere

from zero to $178 million, with the likely recovery on the low

end given the risks involved in maintaining this litigation.[11]

Given the uncertainty of plaintiffs' recovery in light of the

dismissal of several cases raising similar claims, I conclude

that the value of relief in the aggregate is a reasonable

approximation of the value of plaintiffs' claim.

The objectors also make the more specific contention

that coupons offered in this case do not provide sufficient value

to the class plaintiffs.  In the *Pelayo/Ross-Pineda* case, Judge

Pallmeyer, considering a settlement similar to that proposed

here, noted that, to the contrary, "a well-designed coupon

settlement can provide class members with more value than a cash

settlement because the defendant is likely to be much more

generous in its coupon offer."  *In re Mexico Money Transfer*, 164

_____

[10]The parties estimate approximately $144 million
derives from Subclass One transactions and $34 million derives
from Subclass Two transactions, and $283 million derives from
Subclass Three transactions.

[11]In accordance with established law, I do not take
into account the possibility of treble damages under RICO when
considering the reasonableness of a proposed class action
settlement.  *See County of Suffolk v. Long Island Lighting
Co.*,907 F.2d 1295, 1324 (2d Cir. 1990) ("[I]t is inappropriate to
measure the adequacy of a settlement amount by comparing it to a
possible trebled base recovery figure.")

F. Supp. 2d at 1018-1019.  This is particularly true where, as here, the coupons are freely transferable, immediately available and valid for a significant period of time.

Geoffrey P. Miller, a law professor at New York University Law School, a nationally recognized expert in the area of coupon settlements, has noted that a well-designed coupon settlement, such as the one in the present case, can offer superior benefits to class members as compared with the best available cash settlement, because the defendant will typically be willing to provide substantially more value in a coupon settlement than it ever would have agreed to pay in a cash settlement.  (*See* Decl. of Geoffrey Miller, appended to Decl. of Jim Dibe, Esq. ¶¶ 17-18.)[12]  The attributes of a well-designed, valuable coupon settlement, according to Professor Geoffrey Miller, include: (1) that the coupons can be redeemed for a product or service that the class members are likely to purchase even without the coupon; (2) that the product or service for which the coupon can be redeemed is readily available and does not have idiosyncratic features that make it a poor substitute for products or services offered by others; (3) that the coupons can be used immediately upon receipt; (4) that there is a

---

[12]Professor Geoffrey Miller has published a number of law review articles on class settlements, including the issue of coupon settlements.  His leading article on the subject of coupon settlements, "Non-pecuniary Class Action Settlements," 60 Law and Contemporary Problems 97-154 (1997) has been cited in a number of leading cases involving non-pecuniary forms of relief, including the *Pelayo/Ross-Pineda* action.

relatively lengthy redemption window; and (5) that the coupons are transferable.  (*Id.* ¶ 19.)

All of these prerequisites are present in the proposed class settlement.  Because the class members are or were users of defendants' money transfer services, they have already demonstrated a likelihood of purchasing defendants' services with or without a coupon.  *See In re Mexico Money Transfer*, 164 F. Supp. 2d at 1019, 1027 ("It is reasonable to assume that class members, who have used Defendants' transfer services before, will have need for such services in the future. . . . class members often engage in multiple or repeat transactions."); *see also* Decl. of Geoffrey Miller, ¶ 21.  The vast majority of the class members appear to be repeat customers and that no inducement will be necessary to encourage them to use defendants' money transfer services.

Second, defendants have more than 170,000 agent locations in more than 190 countries and territories around the world and, hence, are not likely to have any difficulty in finding an agent location at which to redeem their coupons.  *See id.* ("It is reasonable to assume that Class Members . . . will have little difficulty finding an agent location from among the large network of Defendants' agents throughout the country.")

Third, according to the terms of the proposed settlement, the coupons will be immediately available after issuance.  As noted by Professor Miller, the immediate

- 29 -

availability of the coupons is important because it reduces the risk that they will be misplaced or lost.  (Decl. of Arthur Miller, appended to Decl. of Jim Dibe, Esq. ¶ 27.)

Fourth, the coupons will remain valid for 35 months from their date of issuance, a comparatively long period for coupon settlements.  *In re Mexico Money Transfer*, 164 F. Supp. 2d at 1019, 1027 (valid for 35 months); *Trowbridge II*, 292 F. Supp. 2d at 188 (six months); *Shaw v. Toshiba American Information System, Inc.*, 91 F. Supp. 2d 942, 960-61, 983 (E.D. Tex. 2000)(holding that one-year discount coupons were a "model" for the design of non-cash class action settlements).  As Professor Miller notes, a lengthy redemption window increases the likelihood that class members will use the coupons.

Fifth, the coupons are freely transferable and can be used at par value by any holder.  As a result, even those defendants who no longer use defendants' service will be able to sell their coupons or give them away.[13]  *See In re Mexico Money Transfer*, 164 F. Supp. 2d at 1019, 1027; *In re Cuisinart*, 1983 WL 153, at *4 ("fact that coupons are transferable enhances their economic value"); *Shaw*, 91 F. Supp. 2d at 960-61, 983.  According to Professor Geoffrey Miller, the transferability feature of the coupons essentially makes them cash equivalents because a class

---

[13] Objector Bernard Green's objection to the coupon settlement was based on his desire that they be made transferable.  However, the proposed settlement provides that the coupons will be transferable.

member could literally stand inside an agent location and give or sell his coupon to the next person who approaches the counter. (Decl. of Geoffrey Miller ¶ 23); *Nintendo*, 775 F. Supp. at 681 (concluding that the transferability feature of the coupons potentially rendered them "cash equivalents").

The fact that the settlement coupons can be used in addition to any other discount, sale, or promotion further enhances their value and demonstrates that the coupons are not a mere marketing gimmick. *See In re Mexico Money Transfer*, 164 F. Supp. 2d at 1019, 1027 (noting with approval that class counsel negotiated for the coupons to be valid "in addition to any other discount or promotion . . . to minimize the possibility that such coupons become no more than a marketing tool for defendants."); (Decl. of Geoffrey Miller ¶ 25) (ability to use coupons in tandem with other offer represents significant concession on part of defendants and indicates that risk of coupons being used as a marketing gimmick has been eliminated).

Finally, the face value of the coupons represents a substantial discount off of the current transfer fees paid by class members. Pursuant to the terms of the settlement, class members would pay from 13 to 40 percent in fees for a $250 transfer.[14]  The District Court of Maine rejected the initial

---

[14]According to Professor Geoffrey Miller, the amount to transfer $250 to five destination countries with the largest volume of transactions ranges from $9.99 to $29.00.  Accordingly, a $4.00 coupon represents a savings of 13 to 40% off the current

(continued...)

proposed settlement in *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, reasoning that 50% discount coupons did not represent a substantial savings off the record clubs' ordinary marketing efforts.  In Judge Hornby's opinion, the coupons were "unlike the coupon settlement in [*Pelayo/Ross-Pineda*], where there was no evidence that other discounts were available, and class members could sell or give away their discounts to others."  *Trowbridge I*, 216 F.R.D. 197, 221, No. 1361 (D. Maine, June 13, 2003).  The Court distinguished the coupon component of the settlement based on the relative value of the coupons in the earlier money transfer class action approved in the 7th Circuit.  Moreover, class members would not be required to purchase a "big ticket" item in order to obtain a benefit from the coupon.  See *In re Mexico Money Transfer*, 164 F. Supp. 2d at 1019, 1027; (Geoffrey Miller Decl. ¶ 21; Arthur Miller Decl. ¶ 27.)

Plimpton and Esposito also object to the coupon settlement because, they contend, the redemption rate of the coupons will be low.  They contend that many class members (1) will not bother to read the class action notice; (2) actually object to the proposed settlement but did not take the time to formalize their objections; (3) will not update their addresses

---

[14](...continued)
transfer fee.  Similarly, the fee for class members who receive C$250 from Canada is C$20, with members receiving a C$5.15 coupon, which represents a 25% savings off the transfer fee. (Decl. of Geoffrey Miller ¶ 26).

if they move; (4) are unlikely to take the time to fill out claim forms; and/or (5) will find the coupons more difficult to use than defendant's internet offers.

Such objections are speculative.  Neither Plimpton nor Esposito have provided any factual support for their apprehensions.  While some of these concerns are legitimate, the same factors would be present for any class action settlement, including a cash settlement, especially one where the stake of each class member is relatively small.  A number of factors included in the settlement will promote participation by class members.  As discussed above, the coupons will have real value to the class members.  Class members need not read the class action notice to receive coupons – the settlement administrator would automatically send a claim form to every person who received a notice.  In addition, the claim forms are easy to complete and contain clear instructions.  (See Joint Application for Approval of the Manner and Form of Notice, December 18, 2002, Ex. L-M).  Most class members would have to do no more than sign the claim form and return it to the settlement administrator in a postage-prepaid envelope.  If a class member disagrees with the pre-printed information on the claim form, he or she need only provide general information about his or her transactions to receive additional settlement coupons, and need not submit proof unless defendants challenge the claim.

With respect to the concern that many individuals will not update their addresses, the parties point out that 3,616

class members have already done so since this litigation began.
While as of March 22, 2004, the Postal Service had returned over
8 million notices as undeliverable, roughly 45% of the total
mailing, the parties attest that this number is "within the range
of anticipated undeliverables, given the length of the class
period, the size and the mobility of the Settlement Class, and
the likelihood that some name and address information may not
have been accurately provided or entered at the time of the
initial transactions."   (Decl. of David Isaac ¶ 12.)  Of the
13.6 million notices sent in the *Pelayo/Ross-Pineda* settlement,
43% were returned undeliverable.  *In re Mexico Money Transfer*,
164 F. Supp. 2d at 1020.  The parties additionally represent that
763,099 domestic addresses were updated by running class members'
addresses through the National Change of Address database prior
to sending the claim forms, or 4% of the total mailing.  (Decl.
of David Isaac ¶ 8.)

        The objection that defendant's special internet offers
are likely to discourage the use of the coupons appears unfounded
in fact.  Despite the existence of special internet offers, the
overwhelming majority of money transfers continue to be sent from
agent locations.

        Esposito and Plimpton also argue that there should be a
minimum redemption rate for the settlement coupons.  They contend
that the failure to require a minimum percentage of coupon use
before defendants can meet their obligations under a settlement
represents a conscious choice in defendants because "they have

every reason to believe [a minimum percentage of use] could not and would not be realized."[15]   (Plimpton/Esposito Objection, Ex. C-10 to Isaac Decl.)   Courts have questioned coupon redemption rates in rejecting class action settlements.  *See Buchet et al. v. ITT Consumer Financial Corp. et al*, 845 F. Supp. 684, 687 (D. Minn. 1994).   In a class action concerning the alleged deferral of loan payments without the knowledge or consent of the borrower, the Court, citing "extremely low redemption rates of scrip issued as part of a settlement in another class action involving ITT", rejected a settlement that provided $25 credits on new loans for each deferral, where the coupons were only available for new loans, among other restrictions to claimants. *Id*. at 691-696.   In the present case, however, there are no such barriers to redemption.   Many coupon settlements have been approved without such a requirement.  *See Cusack v. Bank United of Texas*, 159 F.3d at 1041; *In re Mexico Money Transfer*, 164 F. Supp. 2d at 1029 ("Nor is there any requirement imposed in the case law that the settlement agreement include a minimum redemption level for coupons"); *Williams*, 1995 WL 765266; *Trowbridge II*, 292 F. Supp. 2d 184; *Charles v. Goodyear Tire Rubber Co.*, 976 F. Supp. 321 (D.N.J. 1997); *In re Cuisinart*, 1983 WL 153.

---

[15]Plimpton and Esposito contend that this Court should commission its own independent expert to analyze the expected redemption rate.  The parties contend, however, that no precedent exists for such a course.

Finally, Plimpton and Esposito, as well as John B.
Wason, argue that the proposed settlement is fatally flawed
because defendants will retain the value of the coupons not
redeemed.  The parties contend that there is nothing unusual
about this fact and whenever a settlement involves coupons as a
component of compensation some will not be redeemed.  The parties
point to the fact that numerous settlements involving coupons
have been approved by courts despite this fact.

*Other Objections by Esposito and Plimpton*

Esposito and Plimpton object on four additional grounds
unrelated to the coupons.  These additional grounds concern the
adequacy of representation, incentive payments and conflicts of
interest.

*Adequacy of Representation*

First, Esposito and Plimpton contend that the named
plaintiffs do not adequately represent the class because (1) it
is inconceivable for four individuals to represent the interests
of five to seven million individuals, (2) no representative
sampling was conducted to determine what form of compensation or
other features would be most beneficial to class members, and (3)
the named plaintiffs only support the proposed settlement because
of the incentive awards they are receiving.[16]

---

[16]The parties propose incentive payments to each of the
four named plaintiffs in the amount of $2,500, or a total of
$10,000, although they assert that class representatives do not
(continued...)

- 36 -

However, the legal test for adequacy of representation in a class action does not require any particular ratio of representatives to class members, representative sampling, or surveying of class members.  Rather, what is required is that named plaintiffs have typical claims, have no interests antagonistic to class members, and be required to make the same showing as the absent class members to establish defendants' liability.  *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).  These issues were already addressed in my preliminary approval order and I found that the named plaintiffs adequately represented the class.  (*See* Preliminary Approval Order at 19, 21.)  The parties have represented that the named class members were actively involved in all aspects of this litigation and were consulted by class counsel before any relevant decisions were made.

### Incentive Payments

Courts have approved incentive awards "to compensate named plaintiffs for the risk they have incurred by pursuing the class action and the extra effort they have expended."  *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 94-CV-5587, 2003 U.S. Dist. LEXIS 8239, at *7, (S.D.N.Y. May 15, 2003).  In another case, plaintiffs cited a study that found the average payment between $1,000 and $5,000.  *Shepard et al. v. Consolidated Edison*

---

[16](...continued)
know of this request.  Roddy Decl., March 25, 2004, ¶ 45.

*Co. of New* York, 94-CV-0403, 2002 U.S. Dist. LEXIS 16314, at *22,

n.10 (E.D.N.Y. August 1, 2002).   The Court noted that:

> Courts in this circuit generally make these
> awards based upon 'the existence of special
> circumstances including the personal risk (if
> any) incurred by the plaintiff-applicant in
> becoming and continuing as a litigant, the
> time and effort expended by the plaintiff in
> assisting in the prosecution of the
> litigation or in bringing to bear added value
> (e.g., factual expertise), any other burdens
> sustained by that plaintiff in lending
> himself or herself to the prosecution of the
> claim, and of course, the ultimate recovery.'

*Id*. at *16-17 (citing *Roberts v. Texaco, Inc.*, 979 F. Supp. 185,

200 (S.D.N.Y. 1997)).   This Court approved incentive awards in

the amount of $3,000 where plaintiffs "devoted substantial time

to the pursuit of [a] lengthy case, including reviewing

successive pleadings and responding to written discovery

requests."   *In re Medical X-Ray*, 1998 U.S. Dist. LEXIS 14888, at

*24; *See also Golden v. Shulman*, No. CV-85-3624, 1998 U.S. Dist.

LEXIS 15449, at *19 (E.D.N.Y. September 30, 1988).

However, Courts have reduced, rejected or questioned

incentive awards where named plaintiffs

> did not perform any extraordinary services to
> the class . . . A class representative is a
> fiduciary to the class.   If class
> representatives expect routinely to receive
> special awards in addition to their share of
> the recovery, they may be tempted to accept
> suboptimal settlements at the expense of the
> class members whose interests they are
> appointed to guard.

*Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720-721
(D.N.Y., 1989); *see also Trowbridge II*, 292 F. Supp. 2d at 189
(where the court reduced the amount from $5,000 to $2,500,
concluding that the original amount was "too generous . . . for
what these two individuals did."); *Women's Committee for Equal
Employment Opportunity (WC=EO) v. National Broadcasting Co.*, 76
F.R.D. 173, 181 (D.N.Y., 1977)(upholding a class action
settlement, but noting that "when representative plaintiffs make
what amounts to a separate peace with defendants, grave problems
of collusion are raised").

        In support of the application for Class
Representatives' incentive awards, the parties assert that named
plaintiffs Ana Cruz and Ramata Sly, representatives of Subclass
One, Albert Lewis Vale, representative of Subclass Two, and Clare
Sambrook of Subclass Three, met with their respective counsel on
a regular basis, supervised and participated with plaintiffs'
counsel, conferred with them about the Settlement, and each of
them knowingly consented to the Settlement as being in the best
interests of the Settlement Class.  (Roddy Decl., March 25, 2004,
¶ 45.)  Moreover, the parties testify that to the best of their
knowledge, none of the named plaintiffs were promised an
incentive award or were told that they should expect one.  *Id.*
This would seem to defeat the purpose of encouraging
participation of class representatives by offering "incentives".
Nonetheless, the practice of awarding cash awards to class
representatives is well-established in class actions here and in

- 39 -

other districts.  Accordingly, I am not persuaded that the
disbursement of incentive awards creates a conflict of interest
between the class representatives and class members as the
objectors suggest.  Because the parties request that the awards
be disbursed as reimbursable expenses requested by plaintiffs,
the issue regarding the specific amount will be addressed in this
Court's Judgment and Order in response to plaintiffs' motion and
application for payment of attorneys' fees and reimbursable
expenses.

### Conflict of Interest

Esposito and Plimpton argue that there is also a
conflict of interest between class members, on the one hand, and
class counsel, on the other hand, because their respective
economic interests are "widely divergent."   According to
Esposito and Plimpton, the some $2.25 million in fees sought by
class counsel

> presents a classic conflict of interest because it (I)
> pits Class Counsel against its own clients who do not
> receive cash and have to file claim forms and pay money
> out of their pocket to use coupons, which are unlikely
> to be needed or used by many Class members in the first
> place, and (ii) puts Class Counsel on the side of
> Defendants who receive a very favorable settlement
> mostly in return for paying large cash fees to Class
> Counsel in order to avoid potential liability and
> litigation.

(Plimpton/Esposito Objection, Ex. C-10 to Isaac Decl., at 10.)

This Court shares Judge Easterbrook's concern in
*Pelayo/Ross-Pineda* that "[t]his is one of many class actions in

- 40 -

which everyone other than the plaintiffs has been paid in cash.
The attorneys got cash, the charitable organizations got cash,
and the customers got coupons." *In re Mexico Money Transfer*, 267
F.3d at 748." However, courts have consistently upheld class
action settlements notwithstanding differences in the economic
interests of class counsel and class members. *See Maywalt v.
Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078-79 (2d Cir.
1995) (disparity in compensation between class counsel and class
members exists "without any conflict of interest in many class
actions" and does not raise presumption of conflict); *In re
Mexico Money Transfer*, 164 F. Supp. 2d at 1033 (no conflict where
attorney fees negotiated separately and compensation to class
members is significant).

Esposito and Plimpton contend that there was an absence
of arms-length negotiations between class counsel and defendants.
I have, however, already ruled on that when addressing the
procedural requirement that the settlement be achieved through
arms-length negotiations.

In addition, Esposito and Plimpton argue that the
proposed settlement wastes scarce judicial resources and instead
demand a cash settlement or a resolution of the claims on the
merits. However, as courts have held, class action settlements
with terms that are fair, adequate, and reasonable actually serve
the public interest and conserve judicial resources. *See, e.g.,
Bano v. Union Carbide Corp.*, 273 F.3d 120, 129-130 (2d Cir. 2001)
("[t]he public interest in amicable resolution of cases is

particularly strong" in class action litigation); *Anita Foundations, Inc. v. ILGWU Nat'l Retirement Fund*, 902 F.2d 185, 190 (2d Cir., 1990)("Courts are wary of disturbing settlements, because they represent compromise and conservation of judicial resources, two concepts highly regarded in American jurisprudence"); *Franklin v. Kaypro Corp*, 884 F.2d 1222, 1229 (9th Cir. 1989) ("overriding public interest in settling and quieting litigation" is "particularly true in class action suits").  Indeed, the objectors concede that "the claims involved are obviously weak and speculative" and that plaintiffs faced "obstacles [that] are virtually insurmountable.").

Finally, Esposito and Plimpton argue that the right to exclude themselves from the proposed settlement does not offer any meaningful alternative to class members.  According to the objectors,

> [t]he amount at stake in this case [is] so minimal, on an individual Class member basis, that it is unlikely that many Class members will bother to opt out.  Even if they do, it is totally unrealistic to think that they will bother [to] sue on the claims involved . . . the hurtles [sic] and obstacles to any such suit are virtually insurmountable and . . . the claims involved are obviously weak and speculative.

(Plimpton/Esposito Objection, Ex. C-10 to Isaac Decl., at 10.)

As the parties note, the Supreme Court in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)has affirmed the viability of opt-out procedures in cases where the stakes of individual plaintiffs are small.  The fact that the amount at

stake is small for each class member does not detract from the fact that opt-out provisions protect the individual plaintiffs' rights to notice, an opportunity to be heard, and to adequate representation. In addition, the small stakes and opt-out provisions involved here have been present in many court-approved class action settlements.

*Recovery of Alleged Damages is Less than 100%*

Three objectors argue that the proposed settlement will not fully compensate them for their alleged loss, and suggest as an alternative that they be provided with compensation equal to 100% or more of their alleged damages.

According to the parties, these objections ignore the reality of the settlement process and the reality that "the essence of settlement is compromise." *In re Union Carbide Corp. Consumer Products Business Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989). By settling, both sides gain the benefit of immediate resolution of the litigation and some measure of vindication of their respective positions but forego the opportunity to recover all potential losses or completely avoid liability. *See EEOC v. Hiram Walker & Sons, Inc*, 768 F.2d 884, 889 (7th Cir. 1985). Given the admitted infirmities in plaintiffs' complaint, the settlement entered into here is fair and reasonable.

*Other Objectors*

*Recovery of Transfer Fees Charged*

- **43** -

Three individuals argue that they should recover the transfer fees charged by the defendant and/or the full principal amount of their transfers, and a fourth individual argues that he should be reimbursed the fees his wife was allegedly required to pay to collect a money transfer.  However, as the parties note, this case concerns the disclosure of exchange rates and any damages must be measured by defendants FX revenue, not the amount of the transfer or collection fees or the principal amount sent.  *See In re Lloyd's Am. Trust Fund Litig.*, No. 96-CV-1262, 2002 WL 31663577, at *24 (S.D.N.Y. Nov. 26, 2002) ("where the objections that are voiced are based on improper assumptions or otherwise flawed arguments, such lack of credible opposition counsels in favor of approving the settlement"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 479 (S.D.N.Y. 1998) ("an objection based on an assertion or argument not readily supportable at trial should not be permitted to bar the settlement").

*Objections to Miscellaneous Provisions of the Settlement*

Six individuals object to miscellaneous provisions.

*Jonathan R. Zell*

Mr. Zell makes coupon-related objections similar to those raised by Esposito and Plimpton, and contends that the coupons offered are worthless because defendants can simply increase their money transfer fees to recoup the losses associated with the coupons.  Mr. Zell also contends that the

- **44** -

settlement should be rejected because (1) defendants have
admitted wrongdoing and their liability is clear, (2) the
disclosure statement provides no benefit to the class, and (3)
the proposed settlement was the product of collusion.

With the exception of two objections, Mr. Zell's
objections mirror those made by Esposito and Plimpton and are
addressed above.  With respect to the objection that transfer
fees could be raised, the parties note that market competition
will prevent defendant from raising its transfer fees.  As Judge
Pallmeyer mentioned in approving the *Pelayo/Ross-Pineda*
settlement,

> Although no provision of the settlement prohibits
> Defendants from imposing price increases that will
> erase the benefits provided by the coupons, the court
> expects that market competition will discourage such
> increase. . . . Unless Defendants have reason to
> suspect that all or nearly all of their customers will
> be armed with coupons on any given day, Defendants will
> not readily be able to recoup the amounts represented
> by the coupons by raising their transaction prices.

*In re Mexico Money Transfer*, 164 F. Supp. 2d at 1029; *see also*
*Williams*, 1995 WL 765266, at *7.

Mr. Zell also contends that the term requiring a
disclosure statement provides no benefit to class members in
light of pre-existing disclosures agreed to in the *Pelayo/Ross-
Pineda* case.  However, as the parties point out, the disclosure
required by the *Pelayo/Ross-Pineda* settlement can be placed on
the back of customer send forms.  In contrast, the required
disclosure agreed upon here must appear on the front of every

- **45** -

customer send form and is "virtually impossible to miss."
Moreover, the parties contend that the disclosure is written in
very simple, direct, and concise language.

### Eugene F. Dynarski

Mr. Dynarski objects on the ground that he has only
transferred money from the United States to Brazil and that this
money transfer corridor is closed. According to the parties,
although Western Union has temporarily ceased offering a money
transfer service from California to Brazil, the service remains
available in the rest of the country. According to defendants,
it is extremely rare for them to eliminate a corridor, even
temporarily, and Western Union has a significant incentive to
work toward reopening the California-Brazil corridor. They add
that because Western Union offers money transfers to more than
180 countries and because the coupons are transferable, Mr.
Dynarski could receive value from the settlement coupons by
giving or selling them to someone who can use them.

### Constance A. Plonowski and John B. Wason

Plonowski and Wason argue that defendants took
advantage of immigrants and their families and the settlement
does not take into account the proportion of harm suffered by
individual class members. As a part of this settlement, the
parties agreed to use aggregate data to calculate the value of
the settlement coupons that would be provided to members of
settlement Subclasses One and Two on a per transaction basis.

- **46** -

They contend that, given the range of transfers sent over time
and the complexity that would be associated with calculating each
class member's individual recovery, this compromise was
reasonable.  Courts have endorsed this type of averaging in class
action settlements.  *See, e.g., In re Medical X-Ray*, 1998 U.S.
Dist. LEXIS 14888, at *13 ("The complexities of proving and
calculating damages increase geometrically in class
actions")(internal quotations and citations omitted); *Nintendo*,
775 F. Supp. at 681; *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL
31663577, at *18 ("[c]lass action settlement benefits may be
allocated by counsel in any reasonable or rational manner");
*Burka v. New York City Transit Authority*, 129 F.R.D. 80, 83
(S.D.N.Y. 1990).

> *Cristina Gonzalez Del Pozo*

Ms. Gonzalez Del Pozo joins in the coupon-related
objections and the demands for 100% recovery, and also complains
that the informational telephone number listed on her class
action notice (for Chile) provided information relating to
auction houses and did not explain the relevant details of the
proposed settlement.  However, the declaration of David Isaac
establishes that the Chilean telephone number provided was
accurate and functional from the time it was introduced on August
25, 2003.  Furthermore, as the parties note, Ms. Del Pozo
obviously received notice of the proposed settlement, as she
submitted a written objection.

- 47 -

*Larry R. Fleurantin*

Mr. Fleurantin, a non-class member, objects to the failure of the settlement to include individuals who sent money to or from Haiti.

As Mr. Fleurantin is not a member of the class, his objection need not be addressed.  However, this lawsuit is about the alleged non-disclosure of FX revenue to their customers.  As explained by counsel in a status conference before this Court, Western Union did not generate FX revenue on money transfers between the United States and Haiti because such transfers were made in U.S. dollars.  Thus, there was no currency exchange and no FX revenue for the transfers.  As a result, Mr. Fleurantin does not share the interests of the class members in this action.

CONCLUSION

For the reasons set forth above, the parties' motion for final approval of the Settlement Agreement is granted.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

Dated:    Brooklyn, New York,
          October 18 , 2004

_____
United States District Judge